NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0374n.06

Case No. 21-4142

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 15, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE NORTHERN DISTRICT OF |
| | ) | OHIO |
| DEWON R. DAWSON, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before:  SUTTON, Chief Judge; BATCHELDER and DONALD, Circuit Judges.

SUTTON, Chief Judge.  Dewon Dawson pleaded guilty to distributing crack cocaine and to possessing a firearm in furtherance of the crime.  Most of the evidence against him was discovered when the police executed a warrant to search his house.  On appeal, he challenges the district court's denial of his motion to suppress the evidence.  We affirm.

I.

FBI Agent James McCann spearheaded a year-long investigation into a drug conspiracy in Youngstown, Ohio.  The investigation relied on wiretaps, confidential informants, and physical surveillance.  With the information gathered from these efforts, Agent McCann determined that Dawson made up part of the base of a drug distribution pyramid that extended upward to his supplier, Sadiya Sow, and from Sow to her suppliers.

From 2016 to 2018, several confidential informants testified to Sow's role in the conspiracy.  In February 2018, officers seized an ounce of cocaine from a customer 20 minutes

after he met with her. From November 2017 to May 2018, wiretap intercepts of Sow's negotiations with her suppliers permitted law enforcement to watch her meet with suppliers to exchange drugs and drug proceeds.

Most of the evidence against Dawson stemmed from a wiretap on Sow's phone between December 2017 and February 2018. Agent McCann, a 25-year veteran, translated the "code words and phrases" used by the dealers to interpret the calls and texts between Sow and Dawson. R.123-1 at 16. During the conversations, the pair used coded language to discuss the quality of drugs Sow had provided to Dawson, negotiate over Dawson's payments for drugs Sow had supplied, and commiserate about Dawson's cousin Darrell (who also obtained drugs from Sow to sell but did not diligently pay her back with the proceeds). Sow's conversations with Dawson and Darrell frequently referenced quantities of cash including "the two thousand dollars," *id.* at 24, "5,000 there, 5,000 there," *id.* at 29, "three grand," *id.* at 31, "2-4," *id.* at 36, and "6," *id.* at 38.

The taped conversations, together with Sow and Dawson's frequent negotiations over payment, enabled officers to identify three occasions in January 2018 when Dawson delivered suspected drug proceeds from his home to Sow. Before one occasion, Dawson texted that "I'm bout to bring u that change." *Id.* at 36. In another text to Dawson, Sow pushed for payment because "[o]ur friend said he'll be in town around 1." *Id.* at 25. The next day, Sow received a text from one of her drug suppliers (from whom officers would later seize four kilos of cocaine), confirming their one o'clock meeting. Sow then texted Dawson that she was "[w]aiting on [him]," after which he drove directly from his home to hers. *Id.* at 25. Within hours, Sow's supplier arrived for their planned meeting, which lasted for a few minutes.

The investigation culminated in Agent McCann's 71-page affidavit in support of a warrant to search multiple locations, including Dawson's home. A federal magistrate granted the search

warrant in May 2018. Officers executed it the next day. At Dawson's home, officers found multiple guns, thousands of dollars, digital scales, and crack cocaine. Dawson, Sow, and other participants in the drug ring were charged with myriad gun and drug related offenses. Dawson moved to suppress the evidence found during the search, claiming the affidavit in support of the warrant did not provide probable cause. The district court rejected the motion. In exchange for dropping the other charges, Dawson pleaded guilty to possessing crack cocaine with intent to distribute and possessing a firearm in furtherance of a drug trafficking crime. The court sentenced him to 10 years. Having reserved the option of appealing the denial of his motion to suppress, Dawson now exercises that right.

II.

The Fourth Amendment says that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In evaluating a request for a search warrant, a court asks whether "there is a fair probability" that "evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). That requires officers both to establish probable cause of criminal activity and to demonstrate a connection between the criminal activity and the site to be searched. *United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018). At stake on appeal is whether the magistrate had a "substantial basis" for finding probable cause. *Gates*, 462 U.S. at 238–39.

Measured by these requirements, this affidavit passes. The 71-page document contains ample information indicating that Dawson distributed drugs and that his home contained evidence of the crime. The affidavit, to start, contains abundant evidence that Sow participated in a drug conspiracy. On top of that, Agent McCann's interpretations of the wiretapped conversations make

clear that Sow and Dawson were discussing a drug trafficking enterprise. In tying Dawson's trafficking to his home, the affidavit described three instances in which Dawson delivered drug proceeds from his home to Sow. Courts give "considerable weight to the conclusion of experienced law enforcement officers"—25 years of experience in Agent McCann's case—about "where evidence of a crime is likely to be found." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) (quotation omitted). That is eminently appropriate here.

No more evidence was required to satisfy the nexus requirement. Courts have upheld residential searches where a defendant drives directly from his home to a drug sale, sells drugs immediately after leaving his house, or returns home after collecting drug proceeds. *United States v. White*, 990 F.3d 488, 492 (6th Cir. 2021). The same logic applies when a dealer goes directly from his home to a supplier's residence after discussing the transfer of drug proceeds. All told, the investigation permitted the magistrate to conclude that Dawson was engaged in drug trafficking and that he stored evidence in his home.

It is not that easy, Dawson cautions. The last of his deliveries to Sow, he notes, occurred in January, months before the warrant was issued in May, rendering the information too stale. But this gap has a simple explanation. Dawson was a small fish in a big investigation. And officers tracked his deliveries only through the Sow wiretap, which expired in February. Nor did Dawson entirely disappear from the affidavit after January. Although officers no longer had access to the contents of their communications, pen register records revealed 82 texts and 61 calls between early April and late May, which Agent McCann characterized as "consistent with their ongoing drug trafficking relationship." R.123-1 at 71.

Dawson minimizes the calls and texts as social interactions between childhood friends, not as drug-distribution efforts. But this claim cannot be squared with wiretap intercepts from other

4

investigation targets, which establish Sow's continued participation in drug trafficking after February. Nor is the friendship explanation convincing. One could also say that Dawson and Sow were childhood friends in December and January, and their conversations at that point either relate to an unusual childhood or, far more probably, a classic drug-distribution business. Dawson offers no coherent explanation why he would suddenly exit the drug business and start discussing social rather than drug-related matters on his calls with Sow—just, as it happens, when the wiretap ended. *See United States v. Greene*, 250 F.3d 471, 475, 481 (6th Cir. 2001) (upholding finding of probable cause when confidential informant's last purchase occurred 23 months before the warrant's issuance).

Shifting gears, Dawson complains that the affidavit did not contain evidence of his criminal history or of controlled buys. But when evaluating probable cause, we must look to what an affidavit "does show," not what it "does not." *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (en banc). Probable cause exists independently of this omission.

Nor does it matter that the word "drugs" never appeared in the texts or calls. As Agent McCann's affidavit thoroughly explained, drug traffickers frequently use "code words and phrases" to evade detection. R.123-1 at 16. In an intercepted call, Sow even chastised one of her suppliers for "texting this shit to my phone" because "we don't do all this talking on our phones." *Id.* at 65. Officers need not hear "magic words" before seeking a warrant. *Cf. United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).

Last of all, Dawson challenges in his reply brief the denial of a second motion to suppress, which accused the arresting officers of misconduct. But this under-developed and belated

challenge says too little and comes too late.  *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019).

We affirm.